IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MARTINA EVANS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civ. No.  MJM-24-3492 |
| | * | |
| GREENWICH INSURANCE a/k/a | * | |
| AXA XL INSURANCE COMPANY, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Self-represented plaintiff Martina Evans ("Plaintiff") initiated this civil action against Greenwich Insurance Company ("Greenwich") and Mikhael D. Charnoff (collectively, "Defendants"). ECF No. 1 (Compl.); ECF No. 10 (Am. Compl.). Plaintiff alleges several tort claims in her First Amended Complaint—including defamation, false light, negligence, and invasion of privacy—and she seeks compensatory and punitive damages totaling $260 million, as well as injunctive relief. *See* Am. Compl. at 10, 13, 16, 18, 20, 22, 25.

This matter is before the Court on Greenwich and Charnoff's Motions to Dismiss. ECF Nos. 14 & 16. Plaintiff filed responses in opposition to both motions. ECF Nos. 21 & 22. Defendants subsequently filed replies. ECF Nos. 23 & 24. No hearing is necessary to resolve these motions. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons set forth below, the Court shall grant both motions.[1]

---

[1] In her responses to Defendants' motions, Plaintiff requests leave to file an amended complaint in the alternative to denying the motions. *See* ECF No. 21 at 41; ECF No. 22 at 24. This alternative motion for leave to amend fails to satisfy the requirements of Local Rule 103.6 (D. Md. 2025). The motion is denied. However, in consideration of Plaintiff's self-represented status, she will be given an opportunity to notify the Court whether she intends to seek leave to amend after reviewing this Memorandum Opinion.

## I.    FACTUAL BACKGROUND[2]

In June 2020, Plaintiff purchased a townhome in the Shipley Homestead Community in Anne Arundel County, Maryland. Am. Compl. ¶¶ 5–6. The community is comprised of over 500 homes and is governed by the Shipley Homestead Homeowners Association ("HOA"). *Id.* ¶¶ 5, 7. From February 2022 through January 2023, Plaintiff served as Treasurer on the 2022-2023 Board of Directors for the Shipley Homestead HOA (the "HOA Board" or the "Board"). *Id.* ¶¶ 7, 9. Shipley Homestead Community resident Valentine Kravets served as a director on the 2022-2023 HOA Board. *Id.* ¶ 10. In January 2023, Plaintiff was re-elected to the HOA Board for a second year-long term, and Kravets was elected President of the HOA Board. *Id.* ¶¶ 10, 12.

Shortly after Plaintiff and Kravets began serving on the HOA Board together in February 2022, Kravets started to "harass[]," "humiliate[]," and verbally "attack[]" Plaintiff. *Id.* ¶ 11. "[O]n numerous occasions," Kravets urged the 2022-2023 HOA Board President Rochelle Bryant "to remove Plaintiff from the Board." *Id.* Kravets's conduct towards Plaintiff worsened once his term as President began in February 2023. *Id.* ¶ 13. On February 28, 2023, Plaintiff filed a claim against Kravets with Greenwich, the insurer for the Shipley Homestead HOA. *Id.* ¶¶ 3, 14. In March and April 2023, Kravets censured Plaintiff. *Id.* ¶ 15. He then read the censures at an HOA meeting and posted them on a public HOA community page. *Id.*

On April 10, 2023, Plaintiff filed a lawsuit against Kravets in the Circuit Court for Anne Arundel County, Maryland (the "Anne Arundel litigation"), alleging defamation, false light, negligence, private nuisance, and assault, and later adding more claims, including racial discrimination. *Id.* ¶ 16; ECF No. 16-2 (Def. Ex. A); *see also Evans v. Kravets et al.*, Case No. C-

---

[2] The facts outlined in this Part of the Memorandum Opinion are drawn from allegations in the Amended Complaint and materials referenced therein.

02-CV-23-000698 (Cir. Ct. Anne Arundel Cnty., Md. 2023). On or about April 21, 2023, Kravets removed Plaintiff from the Board, which he justified by asserting that Plaintiff was not among the top five vote receivers in the 2023 HOA Board election and was therefore an "'illegitimate' Director." Am. Compl. ¶ 17. On May 30, 2023, Charnoff, who was retained by Greenwich, entered his appearance as counsel on behalf of Kravets in the Anne Arundel litigation. *Id.* ¶ 18. The Amended Complaint alleges that "[a]t all times herein, . . . Charnoff acted as an agent, servant, and/or employee and at the behest of [Greenwich]." *Id.* ¶ 19. After a hearing on November 20, 2023, the circuit court dismissed the case. ECF No. 16-2 at 3–6. Plaintiff noticed an appeal the same day. *See* MD. JUDICIARY CASE SEARCH, https://casesearch.mdcourts.gov/ [https://perma.cc/Z7NQ-JESF] (last visited March 9, 2026) (hereinafter "MD. JUDICIARY CASE SEARCH").[3]

On November 30, 2023, Plaintiff emailed Charnoff to express "concern that the HOA's attorney, Kathleen Elmore[,] was racking up legal fees unnecessarily by providing legal services and advice to Kravets" even though he already had counsel. Am. Compl. ¶ 24; *see also* ECF Nos. 21-5 & 22-3 (Pl. Ex. 2) (Plaintiff's email to Charnoff about Elmore). Plaintiff alleges that, in response, Charnoff wrote a "letter" to Plaintiff wherein he made "false," "threaten[ing]," "insult[ing]," "intimidat[ing]," and "humiliat[ing]" remarks against her. Am. Compl. ¶ 25; *see also* ECF No. 1-1 (email).[4] Some of the alleged false statements include: (1) that Plaintiff filed "a vexatious, baseless and petty litigation"; (2) that Plaintiff was "taking up valuable resources of the Court system and imposing real costs to litigants"; and (3) that Plaintiff committed discovery

---

[3] The Appellate Court of Maryland later affirmed the dismissal. ECF No. 16-2 at 1.

[4] Plaintiff describes the document as a "letter" in the Amended Complaint, but an exhibit attached to the Complaint shows that Charnoff's statements were contained in the body of an email. *See* ECF No. 1-1.

violations. *See* Am. Compl. ¶¶ 26, 28–38, 40–41, 70, 73–82, 84, 96, 99–108, 110 (allegations of false statements and accusations made by Charnoff); *see also* ECF Nos. 21-6 & 22-5 (Pl. Ex. 3). Plaintiff also alleges that Charnoff's letter falsely placed all blame on her for delays in the Anne Arundel litigation even though he admitted in court that "his lack of experience, knowledge and skill in Maryland practice" was "the sole reason for the delay in [his] defense" of Kravets. Am. Compl. ¶¶ 117–18, 128–30, 140–42.

According to Plaintiff, Kravets, with Charnoff's consent, shared his letter via email with the entire Shipley Homestead Community and HOA. *Id.* ¶¶ 66, 91, 115, 127, 139, 150. The alleged "false statements" in the letter "bolstered residents to make threatening, harassing emails and posts about Plaintiff on social media," including one that read: "I vote to remove [Martina Evans] from the entire damn neighborhood." *Id.* ¶¶ 41, 67, 93, 164. Charnoff's "false statements" about Plaintiff also "emboldened one of Kravets' witnesses . . . to harass, attack, threaten, and make false accusations against [her]," jeopardizing "her health, financial stability, and livelihood." *Id.* ¶¶ 43, 68; *see also id.* ¶¶ 44–53 (allegations of false statements made by one of Kravets' witnesses, D. Michele Conger). Plaintiff further alleges that Charnoff continued to make "inflammatory statements" about her to the Shipley Homestead Community after November 30, 2023, *id.* ¶¶ 65, 94, and that he disclosed Plaintiff's personal email to the entire HOA without her consent, *id.* ¶¶ 27, 71, 97, 149, 151. Charnoff also allegedly "publicized facts about Plaintiff which were not of valid concern to the public." *Id.* ¶ 165.

On May 28, 2024, Plaintiff received an email from Greenwich's counsel, Ezra Gollogly.[5] *Id.* ¶ 55; ECF No. 16-3 (Def. Ex. B). That day, Gollogly asked Plaintiff to cease all contact with Greenwich directly, and Plaintiff agreed. Am. Compl. ¶ 55; *see also* ECF No. 16-3 at 2, 4. On July

---

[5] The Amended Complaint alleges that "[a]t all times herein, Gollogly acted as an agent, servant, and/or employee and at the behest of [Greenwich]." Am. Compl. ¶ 59.

9, Gollogly reiterated his request via email and asserted that Plaintiff contacted Greenwich directly despite her assurance that she would not. Am. Compl. ¶ 57; *see also* ECF No. 16-3 at 1. Plaintiff denied Gollogy's assertion. Am. Compl. ¶ 57. Plaintiff characterizes Gollogly's July 2024 email as "harass[ment]." *Id.* ¶ 58.

As a result of Charnoff's and Gollogly's conduct, as well as Greenwich's allegedly "negligent hiring and/or supervision" and "negligent training and/or retention" of Charnoff, Plaintiff "suffered extreme physical, mental and/or emotional pain and suffering, fright, nervousness, indignity, humiliation, insomnia, harm, embarrassment, anxiety, anger, confusion, and shame." *Id.* ¶¶ 61, 87, 111, 120, 122, 134, 146. Plaintiff claims that she has also "suffered and continues to suffer . . . harm to her reputation, both personally and professionally as a result of Defendants' actions and/or inactions." *Id.* ¶ 62.

## II.      STANDARD OF REVIEW

Defendants move to dismiss Plaintiff's First Amended Complaint for failure to state a claim. Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may seek dismissal for "failure to state a claim upon which relief can be granted[.]" To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam). However, "a plaintiff's obligation to provide the grounds of h[er] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (cleaned up). While a complaint need not include "detailed factual allegations," it must contain factual allegations sufficient "to raise a right to relief above the speculative level[.]" *Id.* (citation omitted). "[T]ender[ing] 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (third alteration in *Iqbal*).

When considering a motion to dismiss, a court must take the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). At the same time, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" the defendant's liability for the alleged wrong and the plaintiff's entitlement to the remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert denied*, 566 U.S. 937 (2012). Because "motion[s] to dismiss test[] the sufficiency of a complaint," courts assessing such motions are "generally limited to a review of the allegations of the complaint itself." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (quoting *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013)). But a court may also "consider documents that are explicitly incorporated into the complaint by reference," documents "attached to the complaint as exhibits," and documents attached to a motion to dismiss so long as they are "integral to the complaint and authentic." *Id.* at 166 (citations omitted). "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached, the exhibit prevails." *Id.* (citation and ellipses omitted). Courts may also "take judicial notice of matters of public record and other

6

information that . . . constitute adjudicative facts." *Goldfarb v. Mayor of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015) (citations and internal quotation marks omitted).

Courts must construe *pro se* pleadings liberally. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1376 (2021); *see also Folkes v. Nelsen*, 34 F.4th 258, 272 (4th Cir. 2022). "[L]iberal construction does not require [the Court] to attempt to 'discern the unexpressed intent of the plaintiff,' but only to determine the actual meaning of the words used in the complaint." *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006) (en banc)). Thus, a civil complaint by a self-represented plaintiff "still must contain enough facts to state a claim for relief that is plausible on its face." *Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, 637 (4th Cir. 2016) (internal quotation marks omitted) (quoting *King*, 825 F.3d at 214).

## III.   ANALYSIS

Plaintiff's claims against Defendants are founded upon statements Charnoff made in the email he sent Plaintiff on November 30, 2023. *See* ECF Nos. 1-1, 21-6, 22-5. Defendants move to dismiss Plaintiff's claims under Rule 12(b)(6). Charnoff argues that Plaintiff's defamation claim should be dismissed because it was not timely filed, ECF No. 14-1 at 6, which Plaintiff disputes, ECF No. 21 at 6–7. Defendants further argue, *inter alia*, that Plaintiff's claims are barred by the litigation privilege. *See* ECF No. 14-1 at 6–9; ECF No. 16-1 at 5–13; ECF No. 23 at 3–6; ECF No. 24 at 2–4. Plaintiff also disputes that the litigation privilege bars her claims. *See* ECF No. 21 at 8–12; ECF No. 22 at 5–10.

### A.  Statute of Limitations

Charnoff argues that, because Maryland has a one-year statute of limitations for defamation claims and Plaintiff filed her Complaint over a year after his allegedly defamatory statements were

made via email, Plaintiff's defamation claim is time-barred. Plaintiff argues that her filing was timely because November 30, 2024, the last day of the limitations period, fell on a Saturday, and Rule 6(a) of the Federal Rules of Civil Procedure allowed her to file her Complaint the following Monday without running afoul of the statute of limitations. ECF No. 21 at 6.

Charnoff is correct that Maryland law provides a one-year statute of limitations for defamation claims, Md. Code Ann. Cts. & Jud. Proc. § 5–105, that begins to run on the date that the statements are improperly communicated, *see Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 316 (Md. Ct. Spec. App. 1995). But "[t]he Federal Rules of Civil Procedure govern the procedure of civil suits in the United States district courts." *Bowen v. City of Annapolis*, 937 A.2d 242, 261 (Md. 2007). Federal Rule of Civil Procedure 6(a) applies "in computing any time period specified . . . in *any* statute that does not specify a method of computing time." Fed. R. Civ. P. 6(a) (emphasis added). "When a statute of limitations is measured in years, the last day for instituting the action is the anniversary date of the start of the limitations period." *Hernandez v. Caldwell*, 225 F.3d 435, 439 (4th Cir. 2000) (quoting *Ross v. Artuz*, 150 F.3d 97, 103 (2d Cir.1998)). If the anniversary date of the start of the limitations period ends on "a Saturday, Sunday, or legal holiday," the period will "run until the end of the next day that is not a Saturday, Sunday, or legal holiday." Fed. R. Civ. P. 6(a)(1)(C).

Here, the Maryland statute providing the one-year limitations period for defamation suits does not specify a method of computing time and is measured in years. *See* Md. Code Ann. Cts. & Jud. Proc. § 5–105. Therefore, Rule 6(a) must be used to compute the end of the limitations period in this Court. Plaintiff is correct that November 30, 2024, is the last day of the limitations period for her defamation claim. Because this date fell on a Saturday, Plaintiff had until end of day

Monday, December 2, 2024, to timely file suit, which she did. *See* ECF No. 1. Therefore, Plaintiff's defamation claim is not time barred and cannot be dismissed on this basis.

### B. Application of Litigation Privilege to Claims Against Charnoff

Defendants argue that Plaintiff's claims should be dismissed because Charnoff's statements in his November 30, 2023, email are protected by the litigation privilege. For the reasons that follow, this Court agrees. Because each of the tort claims asserted against Charnoff in the Amended Complaint are founded on allegedly disparaging statements in this email, all of these claims must be dismissed.

The litigation privilege, also known as the absolute privilege doctrine,[6] bars tort liability against participants in litigation for statements made in the course of litigation. *Leading Tech. Composites, Inc. v. MV2, LLC*, Civ. No. CCB-19-1256, 2019 WL 4962312, at *2 (D. Md. Oct. 8, 2019) (quoting *Di Blasio v. Kolodner*, 197 A.2d 245, 250 (Md. 1964)). "The purpose of the absolute litigation privilege is to protect the free and unfettered administration of justice . . . by serving the ultimate goal of information exchange and discovery of the truth.'" *O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 113 A.3d 1129, 1139 (Md. Ct. Spec. App. 2015), *aff'd*, 135 A.3d 473 (Md. 2016) (citations and internal quotation marks omitted). The privilege "provides immunity regardless of the purpose or motive of the defendant, or the reasonableness of his conduct." *State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 566 (D. Md. 2019) (quoting *Smith v. Danielczyk*, 928 A.2d 795, 806 (Md. 2007)). In other words, it affords protection even if the defendant who made the defamatory statement acted with purposeful malice,

---

[6] The Court notes that the "litigation privilege," "absolute immunity," and "absolute privilege" refer to the same doctrine, and the terms are used interchangeably in this Memorandum Opinion. *See Callender v. Callender*, Civ. No. TDC-17-3249, 2019 WL 1980700, at *3 (D. Md. May 3, 2019) (noting that the absolute privilege doctrine is "sometimes referred to as the 'litigation privilege'").

intentionally made a false statement, or otherwise acted unreasonably. *Adams v. Peck*, 415 A.2d 292, 293 (Md. 1980).

"Until 2013, every reported Maryland opinion about the absolute litigation privilege arose in the context of a defamation action . . . ." *O'Brien*, 113 A.3d at 1140. Maryland courts have since shifted, holding that "[a]bsolute privilege is a broad defense to tort claims . . . ." *Att'y Grievance Comm'n of Md. v. Frost*, 85 A.3d 264, 278 n.14 (Md. 2014). Though it cannot be said to extend to "any and all" tort claims, the litigation privilege certainly applies "to claims alleging injury from disparaging statements made" during the course of a judicial proceeding. *Anderson v. Hammerman*, 326 A.3d 35, 49 (Md. App. Ct. 2024), *cert. denied sub nom. Innovative Surgery Ctr., P.C. v. Anderson*, 331 A.3d 1283 (Md. 2025); *see also State Farm*, 381 F. Supp. 3d at 571; *Mixter v. Farmer*, 81 A.3d 631, 637 (Md. Ct. Spec. App. 2013) (litigation privilege "is not confined to defamation torts when the same behavior is the subject of other torts").

In Maryland, the litigation privilege applies both to "statements made in a judicial proceeding" or "quasi-judicial proceeding" and to "statements made extrinsic to a judicial . . . proceeding." *Id.* at 566 (citing *Norman v. Borison*, 17 A.3d 697, 708–12 (2011)); *see also Leading Tech. Composites, Inc.*, 2019 WL 4962312, at *2. Given that Charnoff's statements to Plaintiff were made outside of court, the Court will focus solely on the standards that apply to extrinsic statements. There are three common categories of extrinsic statements that are protected by the litigation privilege: "(1) statements made with the direct purpose or effect of producing a judicial or quasi-judicial proceeding"; (2) "statements 'prepared for possible use in connection with a pending judicial proceeding' . . . but which remain unfiled at the time of the alleged injury"; and (3) "statements that are not designed necessarily to produce a proceeding or cause one to be 'filed,' but which are connected contextually to a pending or ongoing proceeding." *Norman*, 17 A.3d at

710–11 (emphasis removed) (quoting *Adams*, 415 A.2d at 294). When faced with the third category of extrinsic statements, Maryland courts distinguish between statements made by witnesses, judges, or parties, and statements made by attorneys of record in deciding whether the litigation privilege applies. *Norman*, 17 A.3d at 708, 712.

To determine whether the litigation privilege applies to statements made by attorneys of record that fall within the third category of extrinsic statements, courts must employ a three-part test. *Id.* at 714. First, courts must determine whether "the contemplated or ongoing proceeding" satisfies the test articulated in *Gersh v. Ambrose*, 434 A.2d 547 (Md. 1981). *Id.* Specifically, the court must assess "(1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements." *Gersh*, 434 A.2d at 552. Put differently, "the court must consider the significance of the public interest sought to be advanced and the protective trial-like attributes of the proceeding." *State Farm*, 381 F. Supp. 3d at 566 (internal quotation marks omitted) (quoting *Norman*, 17 A.3d at 710). Second, courts must determine whether "the context of the statement evinces that the statement was made 'during the course' of the proceeding[.]" *Norman*, 17 A.3d at 714. "When considering the context of the statement, courts ask, among other things: '[W]hat was the overall or general reason for the instrument or letter (but not the motive of the challenged statement itself . . . ); what was the defendant doing when he or she made the statement; and to whom did he or she make the statement.'" *State Farm*, 381 F. Supp. 3d at 566–67 (quoting *Norman*, 17 A.3d at 713). This assessment of the statement's context does not call for the court to evaluate the statement itself. *Id.* at 567. Third, courts must determine whether an extrinsic statement is "'connected contextually' to a pending or ongoing judicial proceeding . . . . 'Connected contextually' means having 'some rational, articulable relevance or responsiveness to [a] proceeding.'" *Harvey v. Cable*

*News Network, Inc.*, 48 F.4th 257, 275 n.8 (4th Cir. 2022) (quoting *Norman*, 17 A.3d at 710–11, 714). If each part of the test is met, "then extension of privilege would serve the ultimate goal of information exchange and discovery of the truth." *Id.* at 714–15.

Charnoff was counsel of record for Kravets in the Anne Arundel litigation. The parties dispute whether his email to Plaintiff on November 30, 2023, is protected by the litigation privilege. Defendants maintain that Charnoff's statements in the email are contextually related to the Anne Arundel litigation and therefore protected by the litigation privilege. ECF No. 14-1 at 7–8; ECF No. 16-1 at 11–12; ECF No. 23 at 5–6; ECF No. 24 at 2–4. Plaintiff contends that Charnoff's statements were not tied to any pending or ongoing proceeding and thus do not fall within the litigation privilege. ECF No. 21 at 11–12; ECF No. 22 at 6–10.

In deciding whether Charnoff's email is protected by the litigation privilege, the Court must start with the two-part *Gersh* test. *See Gersh*, 434 A.2d at 552. First, the Anne Arundel litigation served a significant public interest, as it sought to address tort doctrines such as negligence, defamation, false light invasion of privacy, private nuisance, and assault, as well as antidiscrimination laws, each of which protects important societal interests and deters harmful conduct. *See Kaiser Aluminum & Chem. Corp. v. Westinghouse Elec. Corp.*, 981 F.2d 136, 143 (4th Cir. 1992) (citation omitted) ("[N]egligence . . . claims protect society's interest in freedom from harm."); *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966) ("Society has a pervasive and strong interest in preventing and redressing attacks upon reputation."); *Wolfson v. Lewis*, 924 F. Supp. 1413, 1435 (E.D. Pa. 1996) ("The public has an interest in protecting the privacy rights of . . . citizens."); *Batstone v. Chicago Title Ins. Co.*, Civ. No. RDB-20-00937, 2020 WL 6393164, at *4 (D. Md. Nov. 2, 2020) (recognizing landowners' right to be free from invasions of, or limitations on, the use and enjoyment of their property); *Robinson v. Vitro Corp.*, 620 F. Supp. 1066, 1072

12

(D. Md. 1985) ("The tort of assault is designed to protect a person's interests to be free from apprehension of intentional physical contact."); *Creek v. Vill. of Westhaven*, No. 83 C 1851, 1989 WL 105202, at \*3 (N.D. Ill. Sept. 1, 1989) ("The public interest is undoubtedly served by the deterrence of racial discrimination."). Second, "judicial proceedings are [generally] deemed to contain inherent safeguards against abuse of the [litigation] privilege." *Sodergren v. Johns Hopkins Univ. Applied Physics Lab'y*, 773 A.2d 592, 601 (Md. Ct. Spec. App. 2001), *quoted in State Farm*, 381 F. Supp. 3d at 567. And there is nothing in the Amended Complaint or in the public record to suggest "that the normal safeguards [of a judicial proceeding] [we]re inadequate here." *State Farm*, 381 F. Supp. 3d at 567. Accordingly, the Court finds that the Anne Arundel litigation satisfies the *Gersh* test.

Next, the Court must consider whether Charnoff's statements were "made 'during the course' of the [Anne Arundel litigation] (*i.e.*, while [Charnoff] was participating in the proceeding)." *Norman*, 17 A.3d at 713. Plaintiff argues that "there was no active case" for Charnoff to participate in when he emailed her on November 30, 2023, because her case in the state trial court had already been dismissed and her appeal had not yet received a case number. ECF No. 21 at 9; ECF No. 22 at 8. She points out that Charnoff "confirmed" in his motion that the Anne Arundel litigation had been dismissed on November 20, 2023. ECF No. 21 at 10. That same date, Charnoff sent Plaintiff an email wherein he stated that Plaintiff's case had been dismissed and was "fully terminated in the trial court." ECF No. 22 at 9; *see also* ECF Nos. 21-9 & 22-7. For these reasons, Plaintiff argues, Charnoff's allegedly defamatory statements were made separately from any proceeding and, therefore, are not entitled to the litigation privilege.

The public record and other evidence integral to the Amended Complaint undermines Plaintiff's arguments. To start, public records of Plaintiff's appeal in the Anne Arundel litigation

13

to the Appellate Court of Maryland confirms that Plaintiff filed a notice of appeal on November 20, 2023, the same day the circuit court dismissed the case. *See* MD. JUDICIARY CASE SEARCH. Indeed, Plaintiff attached as an exhibit to her opposition briefs an email she sent Charnoff on November 30, 2023, wherein she reminds him that she "*immediately* filed a timely appeal" after her case was dismissed in the circuit court. ECF Nos. 21-5 & 22-3 (emphasis added). Plaintiff also attached an email she sent Charnoff on November 20, 2023, wherein she stated that she was "just leaving the courthouse after filing an appeal in this case." ECF Nos. 21-9 & 22-7.[7] It is clear that Plaintiff's appeal of the circuit court's decision in the Anne Arundel litigation had been filed and was pending on November 30, 2023, when Charnoff made the allegedly defamatory statements in an email to Plaintiff. Charnoff wrote and sent the email in his capacity as counsel for Kravets, a party to the Anne Arundel litigation, and he addressed and sent the email to Plaintiff, Kravets's opposing party in that litigation. Furthermore, Charnoff's allegedly defamatory email expressly contemplated potentially seeking sanctions against Plaintiff based upon Charnoff's opinion about the manner in which Plaintiff conducted the Anne Arundel litigation and her conduct surrounding the litigation. ECF Nos. 1-1, 21-6, 22-5. In combination, the foregoing facts convince this Court that the allegedly defamatory email was conveyed during the course of the Anne Arundel litigation and while Charnoff was participating in it as counsel.[8]

Lastly, the Court must determine whether Charnoff's statements are connected contextually to the pending or ongoing proceeding. The statements in Charnoff's email are plainly

---

[7] It is troubling that Plaintiff tried to redact the words "after filing an appeal in this case" from her email exhibits. The words are difficult to discern but are still visible through the attempted redaction, ECF Nos. 21-9 & 22-7, and Charnoff attached to his reply an unredacted version of the email, ECF No. 24-1, confirming Plaintiff's representation in the email that she had filed notice of her appeal on November 20, 2023. At this point, the Court perceives no legitimate basis for redacting the phrase confirming that Plaintiff had filed her appeal on November 20, 2023.

[8] Notably, Charnoff served as counsel of record for Kravets in the appeal. *See* MD. JUDICIARY CASE SEARCH.

responsive to the Anne Arundel litigation, which, as discussed *supra*, had already been appealed and was therefore ongoing at the time he sent the email. For example, Charnoff's email specifically discusses (1) Plaintiff's pleadings, prayer for damages and injunctive relief, and brief in opposition to Kravets's motion to dismiss in the Anne Arundel litigation; (2) statements made by the presiding judge during the hearing on the motion; (3) Plaintiff's failure to provide answers to interrogatories in that matter; and (4) whether Plaintiff's conduct in connection with the case was vexatious and sanctionable. *See* ECF Nos. 1-1, 21-6, 22-5. As such, Charnoff's statements were connected contextually to an ongoing judicial proceeding.

Ultimately, the Court finds that Charnoff's statements satisfy the three-part test in *Norman* for extrinsic statements made by attorneys of record that are connected contextually to a pending or ongoing proceeding. Therefore, these statements are protected by the litigation privilege, and the claims asserted against Charnoff in the Amended Complaint, which are all founded upon the protected statements, must be dismissed.

### C. Application of Litigation Privilege to Claims Against Greenwich

Greenwich, as the insurer that retained Charnoff, argues that the litigation privilege applicable to Charnoff's statements gives Greenwich absolute immunity from Plaintiff's suit. ECF No. 16-1 at 8–10. Plaintiff argues that the litigation privilege does not extend to Greenwich because it does not protect "entities." ECF No. 22 at 5–6.

The benefits of the absolute immunity "flow to all participants in litigation." *Day v. Johns Hopkins Health Sys. Corp.*, 907 F.3d 766, 772 (4th Cir. 2018). A court must give the litigation privilege "a broad and comprehensive interpretation, so as to foster the free and unfettered administration of justice." *Norman*, 17 A.3d at 709; *see also Castro v. Goggins*, No. 1:16CV10, 2016 WL 7217282, at *4 (M.D.N.C. Dec. 12, 2016), *report and recommendation adopted sub*

15

*nom. Castro v. Coggins*, No. 1:16CV10, 2017 WL 5749731 (M.D.N.C. Jan. 10, 2017) ("[T]his concept [of litigation privilege] is to be liberally construed in order to insure unfettered access to the judicial process."). Accordingly, the law "affords absolute immunity to those persons who aid the truth-seeking mission of the judicial system[,]" including "judges, prosecutors and witnesses." *Day*, 907 F.3d at 771. And "the scope of the litigation privilege may be expanded when 'a broad reading of absolute privilege makes sense from a policy perspective.'" *Anderson*, 326 A.3d at 50 (quoting *Mixter*, 81 A.3d at 637).

The broad construction of the litigation privilege and the public policy underlying its liberal interpretation call for extending the privilege to protect Greenwich in the circumstances of this case. Although it was not a party, witness, attorney, or judge in the Anne Arundel litigation, Greenwich was a participant in that litigation insofar as it was responsible for providing the defense of its insured, Kravets, who was a party to the litigation, and it hired Charnoff, the attorney who represented Kravets in the litigation. Thus, Greenwich, Charnoff, and Kravets all shared a common interest in the efficient and successful resolution of the claims asserted against Kravets. Furthermore, Plaintiff's theory of tort liability against Greenwich is based solely on Greenwich's hiring of Charnoff to serve as Kravets's attorney in the litigation and an alleged agency and/or employment relationship between Greenwich and Charnoff arising from that hiring. *See* Am. Compl. ¶¶ 61, 87, 111, 114, 122, 124–26, 134, 136–39, 146 (alleging that Plaintiff suffered various injuries as a result of Greenwich's conduct "through its agent Defendant Charnoff").[9] The factual basis for Plaintiff's claims against Greenwich goes no further than the limited extent to which

---

[9] To be clear, this Court takes no position on the merits of Plaintiff's theory of negligence and vicarious liability against Greenwich, and it need not reach that issue because, as explained herein, it finds that the litigation privilege immunizes Greenwich from this suit.

16

Greenwich participated in the Anne Arundel litigation—hiring Charnoff to provide Kravets's legal defense—and allegedly disparaging statements Charnoff made while providing that legal defense.

Given that Charnoff's statements are protected by the litigation privilege, the public policy underlying the privilege warrants extending that same protection to Greenwich for its limited role in the case. As the insurer contractually responsible for hiring Charnoff to provide Kravets's defense in the Anne Arundel litigation, Greenwich "aid[ed] the truth-seeking mission" of that proceeding. *Day*, 907 F.3d at 771. The litigation privilege's purpose in "foster[ing] the free and unfettered administration of justice" would be severely undercut if it protected only a litigant and his insurance-provided attorney from suit while leaving exposed to suit the insurer contractually bound to hire the attorney. *Norman*, 17 A.3d at 709. In this scenario, the insurer would be an easy target for any tort claim that might arise from the attorney's disparaging comments. This position would give the insurer an incentive to intervene in the representation by censuring the attorney to avoid liability to itself, while potentially harming the interests of the insured litigant. That outcome would border on the absurd. Thus, the policy justification for protecting the attorney and the insured litigant from liability for disparaging comments made in litigation applies fully to the insurer responsible for hiring the attorney.

This Court is not the first to hold that the litigation privilege extends to insurers who participate in litigation by providing a defense to their insureds. *See Morales v. Coop. of Am. Physicians, Inc., Mut. Prot. Tr.*, 180 F.3d 1060, 1062 n.3 (9th Cir. 1999) (citation omitted) ("Where an Insurer provides a defense for a party, as here, the [litigation] privilege applies to the Insurer."); *Petty v. Gen. Acc. Fire & Life Assur. Corp.*, 365 F.2d 419, 420 (3d Cir. 1966) ("The insurers retained counsel to defend [the insured] against [an] injured workman's negligence claim . . . . The authority and interest of the insurance companies here . . . make this about as strong as a case could

17

be for protecting their conduct as interested and authorized participants in the settlement to the same extent that a formal party would be protected."); *Doctors' Co. Ins. Servs. v. Superior Ct.*, 225 Cal. App. 3d 1284, 1295–96 (Cal. Ct. App. 1990) ("[W]here, as here, the insurer provides a defense for a party, the realities of the insurer's role in the litigation dictate that the insurer be treated as an authorized participant in judicial proceedings for purposes of [statutory privilege applicable to publications made in judicial proceedings].").

In sum, it would be contrary to the purpose of the litigation privilege and the efficient administration of justice to exclude Greenwich from the litigation privilege and leave it exposed to suit for the litigation-connected statements of the attorney it hired to represent its insured. Accordingly, the Court finds that the litigation privilege extends to Greenwich, and the privilege bars Plaintiff's claims against both Defendants.

## IV.    CONCLUSION

For the foregoing reasons, the Court shall grant Defendants' motions and dismiss the Amended Complaint without prejudice.[10] A separate Order will issue.

3/11/26

Date

Matthew J. Maddox
United States District Judge

---

[10] The Court notes that, in one count of the Amended Complaint, Plaintiff claims entitlement to temporary, preliminary, and permanent injunctions. Am. Compl. ¶¶ 21–63. "Injunctive relief is an 'extraordinary remedy.'"*A Helping Hand, LLC v. Baltimore Cnty.*, 355 F. App'x 773, 775 (4th Cir. 2009) (citations omitted). To obtain an injunction, a plaintiff must establish, among other things, that she has suffered or will suffer an irreparable injury without it, and that it is justified and warranted by the balance of equities. *See id.*; *Ass'n of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482, 499 (D. Md. 2020). Here, the facts alleged in the Amended Complaint fail to establish any irreparable injury or actionable conduct for which an injunction would be warranted, and they do not support a reasonable inference that Plaintiff would suffer irreparable harm absent injunctive relief. Accordingly, Plaintiff's claim for injunctive relief— like the claims for damages asserted in the Amended Complaint—is subject to dismissal.